MARTHA CRAIG DAUGHTREY, Circuit Judge,
dissenting.
Because the record on appeal establishes genuine disputes related to several highly material facts — including what turned out to be the dispositive issues of fact in this case — summary judgment was improperly granted against the plaintiff, Graham Lynch, and in favor of the defendants, ITT Technical Institute, Inc., and Tony Darosa. Even a superficial reading of the evidence reveals that crucial errors were made by the district court, both by making inappropriate findings of fact and misapplying relevant law. Given these mistakes of law and the existence of disputed fact questions that should have gone to a jury, the summary judgment order should not be sustained. From my colleagues’ decision to the contrary, I respectfully but emphatically dissent.
In affirming the district court, the majority rests its opinion on the same crabbed, and frequently incorrect, facts recited in the district court’s decision — many of them distorted because the district court plainly failed to construe them in the light most favorable to the plaintiff, the fundamental legal standard in deciding a defendant’s motion for summary judgment. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the facts were as straightforward as those set out in the majority opinion, the result they reach would be as easily substantiated. In my judgment, they simply are not.
Perhaps the most profound error in the majority’s analysis is its conclusion that in order to “avoid jeopardizing its accreditation, ITT require[d] all instructors to hold a bachelor’s degree in a ‘related area’ to their teaching subject and to have earned at least fifteen semester hours in ‘the subject’ of their teaching.” Thus it follows, also according to the majority, that because Lynch had “neither a bachelor’s degree in a related area nor fifteen semester hours in [information technology or IT,] the subject of his ... teaching,” he was not qualified to teach at ITT and was properly subject to termination. And, according to the majority, Lynch could not make out a prima facie case of discrimination because his designated comparator, John Donnenwirth, was qualified to teach at ITT, given that he had completed 15 semester hours in IT and, thus, was not similarly situated to Lynch. Finally, the majority posits that even if Lynch could establish a prima facie case, he could not rebut ITT’s legitimate business reason for *447 his termination, ie., his lack of qualifications to teach IT.
As the discussion that follows will show, however, there was at least a dispute of fact about all of these propositions, and, in some instances, no basis in fact at all to support them. For example, ITT’s retention of Lynch as an instructor could not have jeopardized the school’s accreditation, because the faculty standards applied to the instructional positions at ITT by its accrediting body, the Accrediting Council for Independent Colleges and Schools (ACICS), did not require either a “degree in a related field” or “fifteen hours in the area of teaching” to qualify in Lynch’s field of instruction. Instead, the ACICS standards provided that instructors teaching courses such as IT “shall hold bachelor’s degrees at a minimum and shall be assigned based on their major and minor academic preparation and/or related experience.” (Emphasis added.) Indeed, even the requirement of a bachelor’s degree was subject to an exception for “instructors who have demonstrable current exceptional professional level experience in the assigned field.” Moreover, the ACICS had inspected Lynch’s credentials on an individual basis in 2007 and registered no objection to his continuation as an IT instructor at ITT’s facility in Warrensville Heights, Ohio. And, finally, John Donnen-wirth’s qualifications to teach IT were considered “questionable” even before Lynch’s credentials came under scrutiny, but Donnenwirth’s qualifications were parallel to Lynch’s, making him a completely adequate comparator in this case. The only dissimilarities between Lynch and Donnenwirth were age (and, thus, the relative length of their professional experience) and race.
What difference does it make to the outcome here that the district court got many of the material facts wrong and failed to recognize the significance of the disputed facts? The answer is simple: an accurate view of the record, taking the plaintiffs evidence and the inferences derived from that evidence as true, fully supports the existence of a prima facie case and, at the same time, demonstrates the pretextual nature of the defendants’ articulated rationale for Lynch’s termination. What is before us is a case that should have been submitted to a jury, as the record plainly shows.
Indeed, most of the facts set out in the majority opinion support a result contrary to the one reached by the district court. Those facts reflect that Lynch was hired in 2006 as an adjunct (part-time) instructor at ITT’s facility in Warrensville Heights and promoted to full-time status within six months. He was 67 at the time, having initially retired after a remarkable career in technology that had spanned some four decades and began in 1962, when Lynch graduated from Ohio University with a bachelor’s degree in civil engineering. Following graduation, he was appointed to the United States Air Force as a second lieutenant and assigned to systems engineering, where he first encountered computers and was engaged in “implementing computer] application for base civil engineering functions.” Fascinated by computers, Lynch decided to make this new field his life’s work. As a result, he left the military in 1968 with the rank of captain and was hired as a manager at IBM during the early years of its computer development and sales. There his duties as a “systems engineer” included “helping] clients program and set up their computing systems.” Working in the burgeoning IT field, Lynch also picked up wide experience, from data processing to the design of technical networks. Ultimately, he became the head of information technology systems for San Diego County, California, the eighth larg *448 est urban area in the country. Along the way, Lynch acquired an MBA from Pep-perdine University and taught training courses in information technology in the military and in industry. He also taught academic courses in IT at Chapman University (a four-year institution), at Riverside Community College in California, and at Brown-Mackie, a technical/vocational school in Ohio. During his teaching career, Lynch taught computer programming, systems design, and networking— all before becoming an instructor at ITT. The majority concedes that “Lynch’s work experience relating to computing is extensive” but fails to recognize that the combination of a bachelor’s degree and his “extensive” IT experience was sufficient to satisfy ACICS’s accreditation standards.
At ITT, Lynch’s performance reviews were consistently above average, and he was a favorite with the IT students, many of whom were African-American — as was Lynch. At the time of his termination from ITT, he was, in fact, the only full-time African-American instructor on the faculty.
The beginning of the end of his tenure started with a purported “rumor” that he had made “race” comments in class, as reported to Ronald McClendon, the dean of students (the highest academic position on campus), by Ann Contiguglia, who was the school’s director (the highest administrative position). McClendon investigated and could find no basis for Contiguglia’s report, but he may not have been surprised by it — according to his testimony, Contiguglia was known to “undervalue” African-America staff members, speaking condescendingly to them and treating them differently from other ITT employees. She made her position on Lynch’s continued employment clear to McClen-don, insisting that “[h]e’s got to go,” although the record reflects no basis for her assertion. There is, for example, no evidence that she considered Lynch unqualified to teach because of his academic record. McClendon, on the other hand, considered Lynch an asset to ITT, both because of his academic credentials and his many decades of experience in the “real world.”
Eventually, McClendon became frustrated with working under Ann Contiguglia and resigned his position as dean. He was replaced by Ronald Lewellen, who also ran head on into Contiguglia’s campaign to have Lynch fired. Almost immediately, Lewellen had the impression that her motivation was “more personal than professional” and became convinced that age as well as race discrimination was part of the dynamic. Lewellen could not rationalize Contiguglia’s animosity any other way, because he considered Lynch fully qualified as an IT instructor.
As previously noted, Lynch’s credentials had been individually scrutinized by ACICS, which required annual reports from, and made periodic on-site visits to, post-secondary educational institutions seeking to maintain accreditation. As part of the process, ACICS officials routinely examined the academic credentials of each faculty member, but they were unable to review Lynch’s file for ITT’s February 2007 report because his university transcripts were missing from the records submitted by ITT. As a result, ACICS declined to find ITT in compliance with its accreditation standards. Lynch’s transcripts were soon located on file at ITT’s headquarters in Carmel, Indiana, and forwarded to the ACICS office for inspection. No questions about Lynch’s academic credentials were raised as a result, indicating that Lynch met the standards set by ACICS for teaching IT. Those credentials were, of course, the same at the time Lynch was terminated by ITT, except that *449 by then he also had two years of successful teaching there.
Nor had any questions arisen about his credentials to teach when he was hired in 2006. He was interviewed by Henry Jones, Chair of the IT Department at ITT, and Rebecca Browning, who was then the academic dean at the Warrensville Heights campus. Jones filled out the evaluation form used in ITT’s hiring process, characterizing Lynch as “exceptional” in every one of some 13 categories on the list— including “education and/or training” and “knowledge of work.” Jones listed “experience, intelligence, [and] motivation” as the qualities that “make this applicant desirable for the position” and ended the evaluation by noting that Lynch was “very impressive.” Indeed, Jones later submitted an affidavit that read: “Mr. Lynch was fully qualified under the criteria of ITT in the area of Informational Technology. At no time did I question Mr. Lynch’s qualifications, or anyone else to my knowledge questioned Mr. Lynch’s qualifications.” (Emphasis added.)
There is no dispute that, despite his myriad credentials to teach, Lynch was abruptly terminated from his position at ITT. There is, however, a major dispute about the reason for his termination that impacts both his ability to establish a pri-ma facie case of discrimination and his ability to establish pretext on the part of ITT in terminating him. The evidence in the record at the summary judgment stage reflects various explanations for Lynch’s departure, depending on whose version is credited. Tony Darosa, the person who actually fired Lynch, testified that he alone made the decision to terminate. But his testimony concerning the basis for Lynch’s termination shifted from one explanation to another, suggesting, if not establishing, pretext. See Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 592 (6th Cir. 2002) (“Shifting justifications over time calls the credibility of those justifications into question. By showing that the defendants’ justification for firing him changed over time, [the plaintiff] shows a genuine issue of fact that the defendants’ proffered reason was not only false, but that the falsity was a pretext for discrimination.”); Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1167 (6th Cir.1996) (“An employer’s changing rationale for making an adverse employment decision can be evidence of pretext.”).
Darosa was an ITT district manager over 11 schools, with an office in Indiana. He visited the Warrensville Heights campus to meet with the department chairs in mid-November 2008 and told them that Lynch would be let go. But he also told them to “keep it a secret” until he came back to Warrensville Heights at the end of the school term, which was two weeks away. Nevertheless, out of respect for Lynch, at least two of the ITT department chairs told Lynch that he was about to be fired, but not why — apparently because they had been given no reason. Lynch said that on the day Darosa returned to campus, December 2, he was escorted to the director’s office by Ron Lewellen, still the academic dean at that time, to meet with Darosa. But Lewellen did not intend to stay and wanted no part in Lynch’s termination; instead, he left the room — as Lynch put it, “in disgust” — slamming the door as he went out. Darosa then informed Lynch that he was being let go, saying only, “[T]here’s nothing we can do. You are not qualified to teach the courses you are teaching, period.” As Lynch later commented, “That was it.”
Indeed, that actually was it. In the meeting, Darosa did not elaborate on Lynch’s purported lack of qualifications, nor did he suggest a way in which any deficiency could be remediated. However, *450 a “memo to file” from ITT’s “human resource partner,” Kim Hansen, dated almost a month before Lynch was officially told of his termination, indicated that the campus was undergoing a reduction in force, a process about which apparently none of the non-administrative staff at Warrensville Heights knew. The memo indicated that Lynch had “been found to not meet the minimum qualifications to teach in the subject area assigned as a full-time instructor” because he “has a Bachelors [sic] degree in Electronics,” not IT. The memo concluded, “There is not an opportunity for Mr. Lynch to teach full-time in Electronics but he will be offered the opportunity to teach on [a part-time] basis or opt for severance.” Of course, the record shows clearly that Lynch’s undergraduate degree was not in electronics, that he had never taught electronics, and that he was not offered a part-time position of any kind when he was terminated as an IT instructor, although by education he was qualified to teach business administration. Again, the record hints strongly at pretext.
Significantly, the memo-to-file was far from the only conflicting evidence concerning the basis for Lynch’s dismissal. Daro-sa’s inability to stick to one explanation or another was particularly confounding. He testified that in reaching the decision to fire Lynch, he had reviewed only Lynch’s “source documents,” by which he meant “resume and transcripts” and nothing else — including performance evaluations. Those teaching-performance reviews, Da-rosa maintained, “wouldn’t necessarily determine whether someone is qualified to teach a course” because “an evaluation would simply ... say [how] this person is doing, is performing at a certain level, but it wouldn’t necessarily qualify someone to teach a course.” Asked if he took “experience in the field” into consideration, as both the ACICS and the ITT standards permitted, Darosa responded, “Absolutely, as long as it’s listed on the resume.” But perversely, he later maintained that he had discounted Lynch’s years of real-world experience because his most recent work was as in management, referring to Lynch’s position as Chief Information Officer of San Diego County and as head of IT contract services for BP North America. These positions, Darosa postulated, “would be too far removed from the lower level help desk person to be an effective [IT] instructor.” What was needed, Darosa said, was entry-level experience, “hands-on first level experience that he would be teaching our students.” But, of course, Lynch had picked up exactly that kind of experience in the various positions he held as he rose to the top in the IT field. Darosa apparently considered experience as a “lower level help desk person” to better equip an IT instructor than the years of experience at every performance level that Lynch brought to the task.
Lynch also had years of experience in the instruction of beginning students like those in his classes at ITT. Surely his extensive teaching credentials qualified him as an IT instructor, Darosa was asked. No, he insisted in response, the ACICS standards did not permit consideration of a candidate’s teaching experience in determining qualifications to teach — even, apparently, when the teaching experience was both extensive and in the same field. Such a standard would be thoroughly ludicrous, if true. But, in this case, it was not true. Several of the academic-curriculum experts who were deposed endorsed teaching experience as particularly relevant to one’s qualifications to teach, and at least one ITT document provided that in hiring instructors “teaching experience is preferred.”
As for Donnenwirth, the comparator, he too lacked a bachelor’s degree in the field *451 of IT, having majored in mathematics. Donnenwirth maintained that because mathematics is the basis for “computing,” he should be considered as having a degree in a “related field.” He also claimed to have 15 hours in the field of IT, but the head of the IT department, Ron Lewellen, testified that Donnenwirth did not have the necessary hours and had actually been hired on the basis of his work experience. Lewellen also said that he considered Don-nenwirth qualified to teach IT based on his classroom performance and what Lewellen had seen of “his interaction with students.” Lewellen considered Lynch qualified to teach IT on the same basis.
According to Lewellen, Darosa had at one time questioned Donnenwirth’s qualifications, and Donnenwirth himself testified that “they were concerned that [he] didn’t have the academic qualifications, ... that [he] didn’t meet the ACICS qualifications to teach IT.” He was saved, Donnenwirth said, by his record of “work experience” and considered his colleague Lynch qualified as an instructor on the same basis. The reason that both Lynch and Donnen-wirth had to be judged on experience rather than their academic background would certainly be apparent to a jury: when Lynch entered engineering school in 1958, there was no field of study known as “information technology.” Perhaps he might have amassed 15 hours in that field two decades later, but by that time he was considered an expert in the burgeoning area and was actually teaching others, rather than taking courses himself. Don-nenwirth was in college in the early 1980s, in the early years of “computer science,” but that was not his major field of study. One of the curriculum experts who was deposed was asked about substituting work experience for academic credentials in hiring instructors. He used wind energy as an example: ‘Tes, th[ere] are new fields, but we do not limit it. You may have a teacher who may not necessarily have a degree in a specific [new] field ... [but has] extraordinary professional experience [in it].” As wind energy is to college curriculum today, so information technology was in the 1960s and 1970s.
The only difference between Donnen-wirth’s apparent security in his faculty position and Lynch’s late-blooming lack of security was that Contiguglia never raised a question about Donnenwirth’s qualifications to teach. On the other hand, she had campaigned to have Lynch removed from the faculty, perhaps as part of a reduction in force as the human resources memo suggested, and she succeeded in bringing about his termination. However, the record is replete with evidence of her animus toward Lynch — animus that was evidently a reflection of her distaste for his race and age. The record also establishes that Lynch was the only instructor that witnesses could remember being fired.
The legal standard for determining discrimination under Title VII and the Age Discrimination in Employment Act is well-known. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff must first establish a prima facie case of discrimination, either by direct evidence or indirectly by circumstantial evidence. To accomplish the latter, the plaintiff must show that he or she (1) is a member of a protected class; (2) suffered an adverse employment action; (3) was nevertheless qualified for the position; and (4) was replaced by someone outside the class or was treated differently from similarly-situated employees who were not members of the protected class. Id. Once the plaintiffs prima facie case is established, the burden falls on the defendant to articulate a legitimate, non-discriminatory reason for the adverse action, and — at that point — the burden shifts back to the plaintiff to show *452 that the defendant’s articulated reason is a pretext for discrimination. Id. at 803-04.
There is no question that, under the McDonnell Douglas framework, Lynch was a member of two protected classes based on his age and race. There is no question that he suffered an adverse employment action. A full review of the record also establishes, as the district court found, that Lynch was fully qualified for the position at issue or — at a minimum— that his qualification to teach at ITT was a matter of disputed fact. Moreover, whether Lynch was treated differently from a similarly-situated employee who was not a member of the protected classes was obviously disputed and should have gone to the jury. We have held repeatedly that Title VII plaintiffs are “not required to demonstrate an exact correlation between [themselves] and others similarly situated” but, instead, “ha[ve] to show only that [they] and [their] proposed comparators were similar in all relevant respects.” Bobo v. UPS, 665 F.3d 741, 751 (6th Cir.2012). In this case, the record is replete with evidence of Lynch and Donnenwirth’s “similarity in all relevant respects.”
The claim of discrimination in this case cannot be brushed aside by a simple declaration that Lynch was not qualified based on his “admission” while being deposed that he did not have the requisite 15 semester hours of study in IT. The statement he made in this regard has been taken out of context, both by the district court and by the majority here. Based on evidence in the record, the jury could find either that Lynch did have the requisite 15 semester hours or their equivalent or that he was not required to have the 15 semester hours because he was fully qualified on the basis of work experience in the field of IT.
Indeed, when Darosa was forced to concede that, based on experience, Lynch met the ACICS standards for teaching courses other than those in general education, he changed tactics and claimed for the first time that ITT’s standards were higher that those necessary to achieve ACICS accreditation and that Lynch did not meet the ITT standards. But this claim conflicted with Darosa’s previous testimony that he had terminated Lynch because Lynch did not meet the ACICS requirements, which put ITT at risk of losing its ACICS accreditation.
Moreover, the claim regarding the heightened ITT standards was supported only by an untitled job description form that met the ACICS requirements for teaching general education courses but clearly did not fit the criteria necessary to teach “courses other than general education,” such as IT. The critical difference between the two classifications was whether work experience could be taken into account as a substitute for a related bachelor’s degree and 15 hours of course work (no, in the case of general education teachers; yes, in the case of those teaching courses other than general education). Allowance for work experience appears nowhere in the submitted job description form. Obviously, a jury could find that the proffered form did not apply to IT instructors.
Thus, the issue comes down to proving the fourth prong of the McDonnell Douglas standard and to resolving the matter of pretext. In my judgment, this case is one in which the same evidence that establishes that fourth prong of Lynch’s prima facie case also satisfies Lynch’s burden of establishing pretext. It seems obvious that Lynch has satisfied the requirements in Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir.1994), overruled on other grounds by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 179-80, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), *453 by showing that the proffered reasons had no basis in fact,” given that Lynch did meet the ACICS/ITT standards for IT instructors, and also that the reason given for termination “were insufficient to motivate discharge,” given that Donnenwirth was similarly situated and was not terminated. But, at the very least, the record establishes genuine issues of material fact that should prevent a .grant of summary judgment and be resolved by a jury.
This circuit has developed an unfortunate practice of resolving the overwhelming majority of civil rights cases that come before us by routinely affirming summary judgment granted to defendants by the district courts, thereby depriving arguably meritorious plaintiffs of their day in court. It is time that we adopted a more respectful approach, one that recognizes that employment actions are inherently fact-based. In doing so, we would honor the admonition of the Supreme Court that “ [credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In this case, the evidence clearly did not point in only one direction but was susceptible to reasonable inferences in Lynch’s favor on the issues of age and race discrimination. The district court, however, plainly engaged in credibility determinations, weighed the evidence in favor of the moving party, and repeatedly misstated facts apparent from the record. Because the majority has put a stamp of approval on the unfortunate result, I respectfully dissent.